USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_7/16/2014___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                  :

JOHN MCDONNELL,                   :

                 Plaintiff,    :

                                   :         12-CV-4614 (VEC)

         -against-          :

                                   :      OPINION AND ORDER

SCHINDLER ELEVATOR CORPORATION,  :
JERRY SPAMPANATO,           :

             Defendants. :
                                   :
------------------------------------------------------------ X

VALERIE CAPRONI, United States District Judge:

      Plaintiff John McDonnell was employed as an elevator maintenance and repairman by Defendant Schindler Elevator Corporation ("Schindler") for more than thirty years. Compl. ¶ 1. Schindler terminated his employment in September 2011. Compl. ¶¶ 13-16, 30. McDonnell alleges he was terminated because of a physical disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq.* ("ADA"), the New York State Human Rights Law, N.Y. Exec. Law § 296(1) ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107.1 ("NYCHRL"). He further alleges that his supervisor, Defendant Gennaro "Jerry" Spampanato ("Spampanato"), affirmatively engaged in and assisted the discrimination and is therefore liable as an aider and abettor under the NYSHRL, N.Y. Exec. Law § 296(6), and NYCHRL, N.Y.C. Admin. Code § 8-107.6 (collectively referred to as the "state law claims"). After substantial discovery, Defendants moved for summary judgment under Fed. R. Civ. P. 56. Dkt. 18.

      For the reasons set forth below, Defendants' motion for summary judgment is GRANTED as to all claims.

## I.      BACKGROUND

Plaintiff's employment by Schindler was governed by a Collective Bargaining

Agreement ("CBA") with Local 1, International Union of Elevator Constructors ("Local 1").

Def. Mem. Law at 1-2; Pl. 56.1 Stmt. ¶¶ 7-8.  At the time of Plaintiff's termination, Spampanato

was a District Service Manager responsible for supervising employees, including McDonnell,

working in the downtown Manhattan district.  Def. 56.1 Stmt. ¶¶ 6-7.  From 2002 until he was

injured in April 2010, Plaintiff was the resident mechanic at Lord & Taylor's flagship Fifth

Avenue store ("L&T").  Def. 56.1 Stmt. ¶ 82.  A resident mechanic is assigned to one building

and performs regular maintenance on its elevators.  Def. 56.1 Stmt. ¶ 8.  Until 2006, Greg Ahart

was L&T's regional engineer responsible for elevators and escalators at the Fifth Avenue store.

Ahart Decl. ¶ 1.  Ahart testified that he was very satisfied with Plaintiff's performance at L&T,

an opinion he made known to Schindler.  Ahart Decl. ¶¶ 9-10.

While McDonnell apparently had a good working relationship with L&T when Ahart was

regional engineer, the relationship deteriorated when the L&T personnel changed.  In 2009,

Elliot Czerwin became L&T's Director of Facilities and assumed responsibility for the elevators

and escalators at the Fifth Avenue store.  Def. 56.1 Stmt. ¶¶ 85-86.[1]  Czerwin "repeatedly

advised Schindler's supervisory staff about Lord & Taylor's dissatisfaction" with Plaintiff's

performance and asked Schindler to replace Plaintiff as L&T's resident mechanic.  Czerwin

Decl. ¶¶ 3, 5.[2]

---

[1]      Defendants' 56.1 Statement indicates that Czerwin replaced Ahart in 2009, but Ahart's declaration states he left the Fifth Avenue store in 2006.  *Compare* Def. 56.1 Stmt. ¶ 86, *with* Ahart Decl. ¶ 1.  Although the identity of the L&T representative between 2006 and 2009 is, therefore, unclear, that is not a material fact in this case.

[2]      Plaintiff claims Czerwin's declaration is "false on its face," but then quarrels only with Czerwin's understanding of the impact of the CBA on Schindler's ability to reassign McDonnell away from L&T.  Pl. Response to Def. 56.1 Stmt. ¶ 88.  Plaintiff's denial that Czerwin complained about him does not create a question of fact as there is no evidence that Plaintiff would know the content of discussions between Czerwin and Schindler's supervisory staff.  In contrast to McDonnell's foundationless assertion that Czerwin's declaration is false, the

Nor were McDonnell's difficulties limited to Czerwin.  In addition to Spampanato, the record includes testimony from two other Schindler supervisors, Steve Penn and Anthony Guerrino.  It is undisputed that all three had concerns about McDonnell's performance.  Def. 56.1 Stmt. ¶¶ 97, 99-100; Guerrino Dep. at 72.

On April 13, 2010, Plaintiff injured his knee while working on an elevator at L&T.  Def. 56.1 Stmt. ¶ 139.  He took medical leave and underwent knee surgery in June 2010.  Def. 56.1 Stmt. ¶ 142; Pl. 56.1 Stmt. ¶ 20.  On August 23, 2010, Plaintiff's doctor cleared him to return to "light duty" with the restriction that he was not to climb stairs or ladders and that he "should be in the same building all day and not on route."  Def. 56.1 Stmt. ¶ 144.

Although not required to do so by its contract with Local 1, Def. 56.1 Stmt. ¶¶ 45, 160, Schindler has a program designed to get injured employees back on the payroll even before they have been medically cleared for full duty, Def. 56.1 Stmt. ¶¶ 143-45.  Schindler's "Early Return to Work" Program ("ERTW Program") permits employees with on-the-job injuries who have not yet been medically cleared for full duty to perform "light duty" assignments for up to 90 days with full pay.  Def. 56.1 Stmt. ¶¶ 46, 48.  If an employee is not medically cleared to full duty after the expiration of 90 days, then he is returned to non-work status until he is medically cleared to assume full duties.  Def. 56.1 Stmt. ¶ 48.  Schindler states that it provides this benefit because workplace injuries are common among elevator mechanics.  Haberle Decl. ¶¶ 3-4.[3]  The program itself appears to be popular.  Between 2007 and 2012, approximately sixteen employees

---

declarations of Spampanato and Anthony Guerrino both corroborate Czerwin's statements.  Spampanato Decl. ¶ 22; Guerrino Dep. 72-73.  Moreover, Raymond Haines (another Schindler employee) testified that McDonnell was concerned about his job prior to the time he was injured.  Haines Dep. at 84-85.  At the very least, Haines's testimony corroborates Defendants' uncontroverted evidence that L&T was not satisfied with McDonnell's job performance.

[3]     One of Plaintiff's witnesses, Joseph Hagnar, Jr., corroborated the high injury rate among elevator mechanics, testifying (hopefully hyperbolically), "[If] you get a hundred elevator guys in the [sic] room, 99 of them are limping."  Hagnar Dep. at 27.

3

took advantage of the ERTW Program before returning to work without incident.  Def. 56.1 Stmt. ¶ 52.  At least four other employees suffered workplace injuries between 2008 and 2011 and collected workers' compensation before returning to work as part of the ERTW Program. Def. 56.1 Stmt. ¶¶ 55-59.  Those employees returned to full duty when they were physically capable without suffering any adverse employment consequences or complaining of discriminatory treatment.  Def. 56.1 Stmt. ¶ 55.

Plaintiff took advantage of the ERTW Program, although he complained that one of his light duty assignments – power washing disassembled escalator steps – was endangering his weakened knee; when he objected to the task, he was relieved of that assignment.  Def. 56.1 Stmt. ¶¶ 147, 149-53.  Because Plaintiff was not medically cleared after the 90-day program, he took a second leave of absence from approximately November 22, 2010, until December 20, 2010; on December 20, 2010, he was medically cleared to return to full duty.  Def. 56.1 Stmt. ¶¶ 159, 161; Def. Exh. F.

It is undisputed that following his medical absence, L&T did not want Plaintiff to return to its store as resident mechanic.  Def. 56.1 Stmt. ¶ 165.  Because there were no other resident mechanic positions available throughout the spring and summer of 2011, Plaintiff worked as a "floater," filling in for other resident mechanics who were on vacation or leave.  Def. 56.1 Stmt. ¶¶ 176, 187.[4]  Plaintiff worked in Spampanato's downtown district and in the uptown district supervised by John Soutar.  Pl. Response to Def. 56.1 Stmt. ¶ 190.  Because the number of

---

[4]      Plaintiff denies that there were no regular positions available; he points to three mechanics who were hired in December before he returned to work, one of whom was rehired the same day he returned to work, and one, Thomas Moore, who was hired after he returned but for the billable repairs group, which requires more specialized skill and involves more physically demanding work than Plaintiff was capable of doing.  Pl. Response to Def. 56.1 Stmt. ¶ 176; *see* Def. Response to Pl. 56.1 Stmt. ¶ 136; Def. 56.1 Stmt. ¶¶ 10-13.  Because Plaintiff's evidence purportedly contradicting Defendants' position does not actually contradict it, the Court finds that there is no question of fact that at the time Plaintiff was cleared to return to duty, there were no resident mechanic positions available.

temporary assignments dwindled at the end of the summer and there were no vacant regular assignments, Def. 56.1 Stmt. ¶¶ 193-94, on September 12, 2011, Schindler informed Plaintiff that he was being laid off due to lack of work.

On November 21, 2011, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Def. 56.1 Stmt. ¶ 211; Def. Exh. O, and on April 17, 2012, the EEOC issued a Right to Sue letter, Def. 56.1 Stmt. ¶ 213; Def. Exh. P.  On June 12, 2012, Plaintiff filed the present action alleging that Schindler terminated him because of his disability in violation of the ADA, NYSHRL and NYCHRL, and that Spampanato aided and abetted Schindler's unlawful activity in violation of the NYSHRL and NYCHRL.[5]

Schindler asserts that it terminated Plaintiff in the face of no available positions because he was the lowest ranked elevator mechanic in Schindler's "rack and stack" rankings for Spampanato's district[6] and because of his consistently poor performance at L&T.  Def. 56.1 Stmt. ¶¶ 108-09, 194-95.  The CBA in effect at the time of Plaintiff's termination states: "Whenever a [sic] Employer decides to reduce its work force on any job, it shall select the Employees to be retained on the basis of competency, ability to perform the available work and length of all prior service with the Employer."  Def. Exh. AA at 6.  According to Schindler, its supervisors evaluated each mechanic under their supervision annually based on various performance metrics.  Def. 56.1 Stmt. ¶ 108.

---

[5]     On March 19, 2012, Plaintiff filed a complaint with the New York Workers' Compensation Board alleging Schindler terminated him in retaliation for filing a workers' compensation claim.  That complaint was based solely on state law.  The administrative proceeding was stayed on September 28, 2012, pending the outcome of the action before this Court.

[6]     One other mechanic, Raymond Haines, was ranked lower than Plaintiff; Haines could not be terminated under the terms of the CBA, however, because he was the shop steward.  Def. 56.1 Stmt. ¶¶ 196-98.

## II.     DISCUSSION

Plaintiff alleges Schindler terminated his employment because of his disability – his knee injury – and that Spampanato is liable under the state laws as an aider and abettor because he actively participated in the decision-making process that led to Plaintiff's termination.  Pl. Mem. Law Opp. at 25.  Schindler asserts that it did not have a position for Plaintiff because: Schindler was undergoing a larger downsizing; L&T refused to accept him when he returned to work after medical leave, which left him without a permanent position; and his poor performance placed him at the bottom of the employee "rack and stack" list.  Def. Mem. Law at 1.  Schindler also claims that Plaintiff was a poor performer who failed to take advantage of training  that would have updated his skill set and made him eligible for certain positions that came available.

The Court finds that Plaintiff has failed to produce evidence from which a reasonable jury could find that Schindler terminated McDonnell because of his disability or that would give rise to an inference of discrimination.  Even if this Court were to conclude that Plaintiff might be able to establish a *prima facie* case of discrimination, summary judgment would nonetheless be appropriate because Plaintiff failed to offer evidence from which a reasonable jury could find that Schindler's non-discriminatory reasons for his termination (poor performance and lack of work) were pretextual.

### a.  Summary Judgment Standard

Summary judgment is appropriate when the record demonstrates that there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," *Holtz v. Rockefeller & Co. Inc,*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "A material fact is one that would 'affect the outcome of the suit under the governing law,' and a dispute about a genuine issue of material fact occurs if the evidence is such that 'a reasonable [factfinder] could return a verdict for the nonmoving party.'" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that it is entitled to summary judgment, *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004), and, in determining whether there is a genuine issue of material fact, "the court must resolve all ambiguities, and draw all [reasonable] inferences, against the moving party," *Sista*, 445 F.3d at 169 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). But, to show a genuine issue for trial exists, the party opposing summary judgment "must offer some hard [admissible] evidence showing that its version of events is not wholly fanciful" and "may not rely on mere conclusory allegations nor speculation." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). "[C]onclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) (internal quotation omitted).

In the context of employment discrimination cases, the Second Circuit has noted that "an extra measure of caution is merited" when considering a motion for summary judgment "because

direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz*, 258 F.3d at 69)).  Nonetheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001), and "trial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)).  Thus, summary judgment remains available in cases alleging employment discrimination if there are no genuine issues of material fact. *Chambers v. TRM Copy Cents. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).  And even in the employment discrimination context, a plaintiff must do more than advance conclusory allegations to defeat a motion for summary judgment.  *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)); *see also, e.g.*, *Smith v. Am. Express Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988) (affirming summary judgment on plaintiff's Title VII claim because plaintiff failed to present more than conclusory and substantially unsupported assertions that the employer's proffered race-neutral rationale was pretext).

### b.  Unlawful Discharge Under the ADA and NYSHRL

#### i.  Applicable Law

The ADA prohibits discrimination against a qualified individual on the basis of disability with regard to terms, conditions, and privileges of employment.  42 U.S.C. § 12112(a).  The NYSHRL provides that it is unlawful for an employer to discharge or discriminate against a person "because of" the person's disability.  N.Y. Exec. Law § 296(1)(a).  The NYSHRL holds

individually liable any person who aids or abets unlawful discriminatory practices.  N.Y. Exec. Law § 296(6).

Plaintiff's ADA and NYSHRL disability discrimination claims are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Sista*, 445 F.3d at 169 (ADA claims); *Estate of Hamilton v. City of New York,* 627 F.3d 50, 55 (2d Cir. 2010) (per curiam) (NYSHRL claims), *abrogated on other grounds by Mihalik v. Credit Agricol Cheuvreux N. Am. Inc.,* 715 F.3d 102, 108-09 (2d Cir. 2013).  The *McDonnell Douglas* framework provides that if a plaintiff makes out a *prima facie* case of discrimination, the burden shifts to the employer to "offer through the introduction of admissible evidence a legitimate, non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  *Sista*, 445 F.3d at 169.

To establish a *prima facie* case under the ADA, a plaintiff must show by a preponderance of the evidence that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  *Sista*, 445 F.3d at 169 (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)).  To establish a *prima facie* case under the NYSHRL, a plaintiff must show that: "(1) he was a member of a protected class; (2) he was competent to perform the job in question, or was performing the job duties satisfactorily; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of discrimination."  *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010).  Whether an employee is disabled within the meaning of the ADA or a member of a protected class under the NYSHRL is guided by the provisions of those statutes.  *See, e.g.*, *Heyman v. Queens Vill. Comm.*

*for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 168 F.3d 68, 72-73 (2d Cir.

1999) (evaluating whether plaintiff was disabled within the meaning of the ADA); *Spiegel*, 604

F.3d at 80-81 (evaluating whether plaintiff was disabled within the meaning of the NYSHRL).

Although "[a] plaintiff's burden of establishing a *prima facie* case is *de minimis*," *Abdu-Brisson*, 239 F.3d at 467, courts evaluating the sufficiency of evidence on a motion for summary judgment must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture," *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1998). "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Id.* (citation and alteration omitted). Thus, to satisfy the final element of his *prima facie* claim under the ADA or the NYSHRL, a plaintiff must have admissible evidence from which a reasonable juror could draw a causal link between the disability and the adverse employment action.[7]

Circumstances that permit a reasonable juror to infer discrimination include disparate treatment; "the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in . . . degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Abdu-Brisson*, 239 F.3d at 468 (citing *Chambers*, 43 F.3d at 37). As to the sequence of events, "nexus of time" alone is not

---

[7]      Although this element is phrased differently between the ADA and the NYSHRL, there is not any practical difference between the two standards. *See, e.g.*, *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 440 n.10 (E.D.N.Y. 2009) ("The legal standards . . . for [a *prima facie* case in] discrimination claims under the ADA and NYSHRL are essentially the same . . . ."). For ease of reading, this opinion will generally use the formulations interchangeably when describing the fourth element of the *prima facie* case.

enough to give rise to an inference of discrimination when gradual adverse job actions began

well before the plaintiff became disabled.  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87,

95 (2d Cir. 2001).

If the plaintiff establishes a *prima facie* case, the defendant must articulate a legitimate

reason for the adverse employment action "which, if believed by the trier of fact, would support

a finding that unlawful discrimination was not the cause of the employment action."  *Patterson v.*

*Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *St. Mary's Honor Ctr.*, 509

U.S. at 507).  "If the defendant proffers such a reason  . . . the defendant will be entitled to

summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a

finding of prohibited discrimination."  *Spiegel*, 604 F.3d at 80 (quoting *Dawson v. Bumble &*

*Bumble*, 398 F.3d 211, 216 (2d Cir. 2005)).  Put differently, the plaintiff, who bears the "ultimate

burden of persuading the trier of fact that the defendant intentionally discriminated against

[him]," must "demonstrate by competent evidence that 'the legitimate reasons offered by the

defendant were not its true reasons, but were a pretext for discrimination."  *Patterson*, 375 F.3d

at 221 (quotations and citations omitted).  "[I]f the plaintiff has failed to show that there is

evidence that would permit a rational factfinder to infer the employer's proffered rationale is

pretext, summary judgment dismissing the claim is appropriate."  *Id.*  If the primary liability of

the employer under the NYSHRL is dismissed, then the accessorial liability of the alleged aider

and abettor must also be dismissed.  *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y.

1999) (citing *Murphy v. ERA United Realty*, 674 N.Y.S.2d 415, 417 (App. Div. 1998)).

### ii.  Plaintiff Has Not Established a Prima Facie Case

There is no dispute that Schindler is subject to the ADA, that Plaintiff was disabled, and that Plaintiff's termination was an adverse employment action.  Nor does either party argue that Plaintiff was not physically qualified to perform the job of an elevator maintenance mechanic at the time of his September 2011 termination.  Schindler appears to contest two elements of Plaintiff's *prima facie* case: whether he was qualified by skill for the resident mechanic positions that became available while he was a "floater" or shortly after his termination and whether he was otherwise performing his job duties satisfactorily; and whether the circumstances surrounding his termination give rise to an inference that he was terminated because of his disability.

Schindler argues that Plaintiff was not qualified for positions involving maintenance of non-Schindler or Westinghouse machinery because he lacked training with that equipment.  Def. Mem. Law at 11.  When evaluating whether a plaintiff alleging discrimination can establish a *prima facie* case, the Second Circuit has instructed that "the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he possesses the basic skills necessary for performance of the job."  *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (quoting *Slattery*, 248 F.3d at 92).  It has further cautioned that "the qualification prong must not be interpreted in such a way as to shift into the plaintiff's *prima facie* case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-[discriminatory] basis for its decision."  *Id.* (quoting *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001)).  Spampanato testified that Schindler's policy is to assign mechanics to a building who have prior experience with that building's particular machinery.  Spampanato Supp. Decl. ¶ 5.  This policy seems entirely appropriate given

the dangers of an improperly serviced elevator.   Although the Court accepts that as Schindler's

well-advised policy or practice, it does not follow that Plaintiff was not minimally "qualified" for

other positions in the *McDonnell Douglas* sense.   Accepting that a jury could find that given his

extensive experience with other elevator equipment McDonnell was "qualified" to work on more

modern equipment, Schindler's reasons for not so placing Plaintiff go to the second prong of the

*McDonnell Douglas* analysis – whether there was a legitimate non-discriminatory reason for

Schindler's action.   *See Sista*, 445 F.3d at 171-72 (explaining the analytical distinction between

"qualification for a job" and a "legitimate, non-discriminatory, reason for an adverse

employment decision"); *see also Donnelly*, 691 F.3d at 147.   Thus, the only element of

Plaintiff's *prima facie* case that is in dispute for his federal and state claims is whether he was

terminated *because of* his disability or under circumstances that give rise to an inference of

discrimination.

Unhelpfully, the sum and substance of Plaintiff's explanation why his evidence

demonstrates that he can prove a *prima facie* case was found at the beginning of Plaintiff's

Memorandum in Opposition to Motions for Summary Judgment:

> [T]here is more than sufficient evidence to meet the *de minimus* burden of a <u>prima facie</u> showing that the termination occurred under circumstances supporting an inference of discrimination.  Mr. McDonnell was employed by Schindler without interruption for over three decades.  For the first time ever, after Mr. McDonnell was injured and was finally returned to work, he was not placed back in his long-held resident mechanic position at Lord & Taylor.  Mr. McDonnell was instead treated as a "floater" and made on several occasions to purposefully engage in laborious physical labor despite his medical condition.  Shortly after that, he was summarily "laid off" for supposed lack of work, despite the fact that (as discussed in more detail in the pretext argument below) (1) there were open available position for which he was fully qualified that were awarded to others, and (2) Schindler hired numerous Maintenance Mechanics contemporaneous to its termination of Mr. McDonnell.

Pl. Mem. Law Opp. at 2-3.  The memorandum then spent the next 22 pages explaining why all of

Schindler's explanations concerning the reasons for Plaintiff's termination were pretextual.

Despite Plaintiff's *ipse dixit* to the contrary, Plaintiff has in fact produced no evidence that tends to show he was terminated *because of* his disability.  The facts leading to Plaintiff's termination began when he was medically cleared to return to work but L&T refused to accept him back as its resident mechanic due to concerns with his job performance prior to his injury. *See* Pl. Exh. KK.  Although Plaintiff disputes Schindler's characterization of the quality of his job performance, the L&T manager testified that he was dissatisfied with the quality of Plaintiff's work and had repeatedly asked that Plaintiff be removed from his position.  Czerwin Decl. ¶ 3.  Plaintiff attempts to create a question of fact by relying on the declaration of an L&T representative who worked with him *five years* prior his termination.  Pl. Mem. Law Opp. at 19. But that evidence does nothing to create a question of fact; the manager at L&T at the time McDonnell was returning to work after injury testified unequivocally that L&T would not take McDonnell back as its resident mechanic.  Czerwin Decl. ¶ 8.  The fact that the prior L&T manager was more favorably inclined towards McDonnell does not create a question of fact about L&T's position in 2010 nor does the different evaluation of McDonnell between the two L&T employees tend in any way to suggest that Schindler discriminated against Plaintiff due to his injury.

Further evidence that Schindler did not terminate Plaintiff because of his disability exists in its decision to allow him to participate in its ERTW Program.  Under that program, Schindler permitted Plaintiff to work light duty jobs for three months, Def. 56.1 Stmt. ¶ 158, and then, after he again went on disability leave because he was not fully recovered, Def. 56.1 Stmt. ¶ 159, accepted him back to work as a floater for ten months even though there were no resident mechanic positions available for him, Spampanato Decl. ¶¶ 39-40, 47-48.  Finally, according to his doctor's medical clearance, Plaintiff was physically able to perform the work of an elevator

mechanic and required no special accommodation for his knee injury.  Def. 56.1 Stmt. ¶ 161.

Plaintiff offers no evidence tending to show that, although Schindler employed numerous

mechanics who have been injured and has gone out of its way to establish a program to get

injured employees back on the job and the payroll as quickly as possible, Def. 56.1 Stmt. ¶¶ 43-

44, 52, it targeted him specifically for adverse employment action because he was injured.

Given these facts, no reasonable jury could find a causal link between McDonnell's disability

and the adverse employment action.

Nevertheless, Plaintiff alleges that a discriminatory purpose can be inferred because, at

the time he was terminated for "lack of work," there were "open available positions for which he

was fully qualified that were awarded to others" and that Schindler "hired numerous

Maintenance Mechanics contemporaneous to [his] termination."  Pl. Mem. Law Opp. at 3.

Taken together, he argues, these facts would allow a reasonable jury to conclude that he was

terminated because of his disability.

Schindler acknowledges that positions came open while Plaintiff was a floater

(specifically a position at the Marriott Marquis Hotel) and several months after he was

terminated (specifically a position at Worldwide Plaza) but asserts that no inference of

discrimination can be drawn because McDonnell was not qualified to perform maintenance on

the particular elevator systems in those buildings.[8]  Def. 56.1 Stmt. ¶¶ 27, 238, 244; Def. Mem.

Law at 18.  Before Plaintiff was terminated, Schindler had offered special training for the

---

[8]     *Compare Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977) ("[T]he *McDonnell
Douglas* formula . . . demand[s] that the alleged discriminatee demonstrate at least that his rejection did not result
from the two most common legitimate reasons on which an employer might rely to reject a *job applicant*: an
absolute or relative lack of qualifications or the absence of a vacancy in the job sought." (emphasis added)); *with
Slattery*, 248 F.3d at 92 ("[T]he qualification necessary to shift the burden to defendant for an explanation of the
adverse job action is minimal . . . .  As a result, especially where discharge is at issue and *the employer has already
hired the employee*, the inference of minimal qualification is not difficult to draw." (emphasis added) (internal
citations omitted)).

elevator systems at issue, specifically, the "state of the art" TXR-5 controller manufactured by

Otis, but McDonnell chose not to take advantage of the training.  Def. 56.1 Stmt. ¶¶ 229, 239.

Although Plaintiff admits that he never attended the training sessions for the TXR-5

equipment, Def. 56.1 Stmt. ¶ 239, he asserts that his experience during a floater assignment

assisting a Department of Buildings licensed tester who was testing TXR-5 controllers qualified

him to service the TXR-5 controllers; accordingly, a discriminatory intent could be inferred from

Schindler's failure to assign him to those positions, Pl. Mem. Law Opp. at 5; Canton Dep. at 29-

31.  According to Spampanato, the skills and knowledge required to service and maintain TXR-5

controllers are very different from the skills necessary to test and inspect elevator equipment.

Spampanato Supp. Decl. ¶ 7.  Plaintiff admits that his experience with the TXR-5 controllers is

limited to testing but is confident that given his years of experience maintaining Schindler and

Westinghouse elevators, he would have been capable of servicing the TXR-5 elevators.  Pl.

Mem. Law Opp. at 5-7.  To support his self-serving contention, Plaintiff offers the opinion of

Lou Canton, the lead mechanic at the Marriott Marquis and instructor for Schindler's TXR-5

training sessions.  Canton testified that he thought Plaintiff "could have handled" the open

Marriott Marquis resident mechanic position, which would have included servicing TXR-5

elevators.  Canton Dep. at 21.  This testimony is insufficient to create a question of fact for a jury

because, by his own admission, Canton had not worked directly with McDonnell with any

regularity for almost 25 years nor did he have the opportunity to observe McDonnell in TXR-5

training.  Canton Dep. at 64-66.  While Canton may, based on his experience with McDonnell 25

years ago, have confidence in his abilities, he lacks sufficient personal knowledge of

McDonnell's current skills or qualifications for his opinion to be admissible at trial under Federal Rule of Evidence 701.[9]

Plaintiff further claims that shortly after he was terminated a position became open at Worldwide Plaza for which he was qualified.  Pl. Mem. Law Opp. at 6-7.  Worldwide Plaza was undergoing a modernization to TXR-5 controllers.[10]  Def. 56.1 Stmt. ¶¶ 236, 238.  Although Plaintiff asserts that a discriminatory intent can be inferred from Schindler's failure to place him at Worldwide Plaza, no jury could so infer.  Even if one were to ignore the fact that, as discussed above, Plaintiff lacked the training necessary to maintain TXR-5 controllers, it is undisputed that (a) the position did not come available until months after McDonnell had been terminated, Def. 56.1 Stmt. ¶¶ 235, 241; (b) Plaintiff never directly applied for the position at Worldwide Plaza, Def. 56.1 Stmt. ¶ 253; and (c) at the time the position actually came available in 2012, Plaintiff was again medically incapacitated – this time with a rotator cuff injury, Def. 56.1 Stmt. ¶ 206.  Given all of those undisputed facts, no reasonable jury could infer a discriminatory intent from Schindler's failure to place McDonnell in the Worldwide Plaza position.

Because Plaintiff has not presented evidence necessary to make out a *prima facie* case, Defendants are entitled to summary judgment.  But even if this Court were to conclude that

---

[9]    Of the two mechanics placed in the Marriott Marquis since Plaintiff's termination, one had experience with the TXR-5 controller; the record is silent on whether the other mechanic did.  One of the mechanics placed at Marriott Marquis was returning to work after rotator cuff surgery, undercutting any argument that McDonnell was not placed into the position because of a prior injury.

[10]    Worldwide Plaza planned to add a second resident mechanic position while it underwent modernization and requested a mechanic familiar with TXR-5.  Def. 56.1 Stmt. ¶¶ 236, 244.  The mechanic selected for the position, Marc Ingerman, had experience with the TXR-5.  Def. 56.1 Stmt. ¶ 245.  The lead mechanic at Worldwide Plaza, John Milne, had approached Plaintiff before he was terminated to inquire whether he would be interested in the position, but by the time Milne suggested Plaintiff be considered for the position, Plaintiff had already been terminated.  Milne Dep. at 19, 43.  Moreover, Milne testified that Plaintiff was difficult to manage.  Milne Dep. at 47.  Milne's testimony does not create a question of fact whether Plaintiff was qualified for the Worldwide Plaza position.  Like Canton, Milne's opinion regarding Plaintiff's qualification to service the TXR-5 equipment would not be admissible at trial because he had not worked with Plaintiff with any regularity in more than 15 years.  He had some contact with Plaintiff when  he filled in as vacation relief at Worldwide Plaza in the summer of 2011, but even then, Milne only saw him serving the old equipment.  Milne Dep. at 44.

Plaintiff's evidence is sufficient to establish a *prima facie* case of discrimination, for the reasons discussed below, Defendants would still be entitled to summary judgment.

###### iii. Even if Plaintiff Were Found to Have Established a *Prima Facie* Case, There is No Evidence that Defendants' Legitimate Reasons for Terminating Plaintiff are Pretextual

Schindler is entitled to summary judgment on the ADA and NYSHRL claims because there is no genuine question of fact that it had legitimate non-discriminatory reasons for Plaintiff's termination. *See Fall v. New York State United Teachers*, 289 F. App'x 419, 422 (2d Cir. 2008) (summary order) (holding the district court did not err in granting summary judgment on an NYSHRL claim because plaintiff failed at the pretext phase of *McDonnell Douglas*, even if the plaintiff may have successfully made a *prima facie* case under the more permissive NYSHRL standard). Schindler's evidence establishes clear and specific reasons for Plaintiff's termination that have nothing to do with his disability. Plaintiff had an antagonistic relationship with the client at his last resident mechanic placement, Czerwin Decl. ¶¶ 3, 5; he was near the bottom of the employee rack and stack, Def. 56.1 Stmt. ¶ 195; and he had poor performance reviews and a bad reputation with Schindler management, Def. 56.1 Stmt. ¶¶ 111, 243. Meanwhile, Schindler was reducing its overall workforce, Def. 56.1 Stmt. ¶ 170, and had no position servicing machinery with which Plaintiff was familiar, Def. 56.1 Stmt. ¶ 192. These reasons are all corroborated by contemporaneous documentation and testimony from Schindler management, as well as non-interested parties such as Czerwin and Milne. *See* Czerwin Decl. ¶¶ 3,5; Milne Dep. at 47. Eliminating Plaintiff's position when he was no longer needed as a floater was unquestionably a legitimate, non-discriminatory decision.

Because Schindler met its burden by proffering several legitimate, non-discriminatory reasons for terminating Plaintiff, any inference of discrimination from the *prima facie* case fades

and Plaintiff has the burden of producing sufficient evidence that would create a question of fact

that Schindler's legitimate reasons are actually pretext for discrimination.  *Spiegel*, 604 F.3d at

80.  Plaintiff may demonstrate Schindler's reasons were pretextual "either by the presentation of

additional evidence showing that the employer's proffered explanation is unworthy of credence,

or by reliance on the evidence comprising the *prima facie* case, without more."  *Sista*, 445 F.3d

at 173.

        Plaintiff asserts that Schindler's reasons are pretextual because: (1) there were positions

available for which McDonnell was qualified, specifically the Marriott Marquis and Worldwide

Plaza positions; (2) Schindler replaced McDonnell by promoting apprentices to mechanic

positions; (3) no other mechanic was laid off due to "lack of work"; (4) Schindler hired other

maintenance mechanics between 2010 and 2012; (5) Schindler's performance documents are a

"sham"; (6) McDonnell was not a poor performer at L&T; (7)  Schindler did not lay off other

employees who engaged in misconduct and were poor performers; (8) Schindler targeted other

employees who had been injured; and (9) email traffic exposes hostility to McDonnell based on

his injury.  Pl. Mem. Law Opp. at 4-25.  None of Plaintiff's arguments is persuasive, and none

creates a genuine issue of fact.

### 1.  Marriott Marquis and  Worldwide Plaza Positions

        These positions are discussed above in connection with whether Schindler's failure to

place McDonnell in the positions tends to demonstrate a discriminatory intent.  For the same

reasons that they do not tend to demonstrate discriminatory intent, they also do not tend to

demonstrate that Schindler's reasons for terminating McDonnell were pretext.  Even if Plaintiff's

view of his own capabilities were credited by a fact finder, there can be no genuine dispute that

Schindler is entitled to prefer employees who have been trained on the equipment they are going to maintain.

### 2. Schindler "Replaced" McDonnell by Promoting Apprentices

Plaintiff's argument with regard to the promotion of apprentices to the mechanic position badly misses the mark. He asserts that he was "replaced" with newly-promoted mechanics, and that "Schindler is reduced to arguing that Mechanics that had just been promoted from being Apprentices were now somehow more qualified or skilled than Mr. McDonnell, a 32 year veteran, in handling elevator equipment." Pl. Mem. Law Opp. at 7-8 (emphasis omitted).

First, there is no evidence that Plaintiff was "replaced" by anyone. The undisputed evidence is that when he returned from medical leave L&T would not take him back and that left him as a floater. His job was terminated when the need for a floater diminished. While Schindler perhaps could have, subject to its CBA with Local 1, bumped another employee in order to retain him if it so chose, the failure to do so does not suggest in any way, shape or form that the company's explanation of a lack of work at the time McDonnell was terminated is pretext for discrimination.

Moreover, although Plaintiff scoffs at the newly-minted mechanics' skill level, the undisputed evidence in the record is that, of the apprentices who were promoted, one was qualified to work on escalators (work which McDonnell refused to do, Spampanato Decl. ¶ 47) and the other three had experience maintaining TXR-5 elevators, Soutar Decl. ¶¶ 17-22, a skill set that McDonnell had not bothered to obtain. In short, no reasonable jury could infer discriminatory intent from the fact that four apprentices were promoted and given positions that McDonnell either did not want or was not qualified to perform.

### 3. No One Else Was Laid Off for "Lack of Work"

Plaintiff asserts that a jury could conclude that Schindler's explanation for his termination is pretextual because nobody else was laid off.  Pl. Mem. Law Opp. at 8-12.  In the first instance, it is a total *non sequitur* to argue that McDonnell could not have been laid off because of a shortage of work unless the shortage was so substantial that more than one position had to be eliminated.  But even if there were logic behind that argument, the undisputed evidence is that the district in which Plaintiff worked reduced its headcount of mechanics by five positions in 2011: two employees retired and were not backfilled; and three employees were terminated (McDonnell, Camilleri and White).  Spampanato Supp. Decl. ¶ 4.  Plaintiff disputes that Camilleri was "laid off" arguing that Schindler lost the L&T contract, and Camilleri "went to work for the new company that took over the contract."  Pl. Mem. Law Opp. at 10.  Regardless of why Camilleri left and was not replaced, the undisputed fact is that he and his position are no longer at Schindler.  As to White, Plaintiff proffered no admissible evidence to refute Schinder's evidence that White was laid off and his position was not replaced.

### 4. Schindler Hired Other Mechanics Between 2010 and 2012

Plaintiff asserts that he can demonstrate that Schindler's non-discriminatory reason for his discharge was pretext because it hired other mechanics from 2010 through 2012.  Pl. Mem. Law Opp. at 12-13.  The fact that Schindler hired other mechanics in 2010 is simply irrelevant as Schindler also brought McDonnell back to work in 2010.  The hires in 2012, at or around the time of McDonnell's termination, could be relevant, but, in this case, those hires could not lead a reasonable jury to conclude that Schindler's non-discriminatory reason for terminating McDonnell was pretext.  Schindler hired new and rehired six formerly-employed mechanics from February through July 2012.  Def. 56.1 Stmt. ¶¶ 300, 302.  At the time of those hires, McDonnell was not available for rehire as he was attending to a torn rotator cuff.  McDonnell

Dep. at 101-07; Def. 56.1 Stmt. ¶¶ 206-08.  Because McDonnell was unavailable to be considered for those positions, the fact that the company hired (and rehired) a few mechanics following his termination has no logical connection to the workforce needs of Schindler five to six months prior.

### 5.  Schindler's Performance Documents are a Sham

While there is no genuine dispute that Schindler supervisors evaluated their employees, the evidence tends to show that the company was not particularly diligent about maintaining records or ensuring that managers actually provided feedback to the rank and file employees. Def. 56.1 Stmt. ¶ 110.  Regardless of how well or poorly the company's managers complied with basic human resources notions of providing timely and effective feedback to employees, the undisputed evidence is that the company evaluated its employees (although the results of those evaluations may or may not have been communicated to the employees) and then ranked the employees from highest to lowest performers in a "rack and stack" document.  Def. 56.1 Stmt. ¶¶ 107, 109, 135.[11]  Schindler asserts that this procedure is designed so that it can prove compliance with the terms of the CBA in the event an employee is laid off and Local 1 challenges the termination.  Def. 56.1 Stmt. ¶¶ 23-25, 106-07.  Schindler does not, however, share its rack and stack documents with either Local 1 or the ranked mechanics, Def. 56.1 Stmt. ¶¶ 107, 135; the rack and stack documents from 2007 and 2010 are part of the record in the case, Def. Exh. J.

Plaintiff received low performance ratings in the years 2004, 2006, 2007, 2008, and 2010, although Plaintiff never signed any of the ratings and denies ever having seen them.  Def. 56.1

---

[11]     After "racking and stacking" the employees, the supervisors would confer to ensure that the lowest-ranked mechanics were being fairly scored to ensure the bottom rankings were fair.  Guerrino Dep. at 32-33.

Stmt. ¶¶ 111, 128.[12]  In the 2007 rack and stack, Plaintiff was the lowest ranked of the scored

employees, Def. 56.1 Stmt. ¶ 122; Def. Exh. J; in 2010, Plaintiff was the second lowest ranked

employee in Spampanato's district (the lowest ranked employee was the shop steward).  Def.

56.1 Stmt. ¶¶ 195-196, 198; Def. Exh. J.  In addition to the performance rating documents

(which Plaintiff may or may not have ever seen), Guerrino, Plaintiff's supervisor immediately

before his injury, testified that Plaintiff's performance was "below standard."  Guerrino Dep. at

72.  Even Plaintiff's longtime friend John Milne testified that Plaintiff had a reputation for

having disagreements with management and for being difficult to manage.  Milne Dep. at 47.

Plaintiff denied that he would have been at the bottom of any legitimate rack and stack,

but the facts he proffers in opposition do not controvert Schindler's evidence.  Plaintiff presents

evidence that Schindler is not diligent about providing its employees feedback in the form of

performance reviews in an attempt to dispute the documents' authenticity.  Def. Mem. Law Opp.

at 16-18.  To that end, Plaintiff cites the testimony of a number of employees who say they have

never or rarely received performance reviews from their supervisors.  *See* Canton Dep. at 48;

Hagnar Dep. at 54-55; Haines Dep. at 37-38; Milne Dep. at 32-33.  Similarly, a number of rank

and file employees testified that they were unaware that Schindler racked and stacked employees

based on ratings from the supervisors.  *See* Canton Dep. at 53; Haines Dep. at 36; Milne Dep. at

33.  Further, a Local 1 representative testified that he had no specific knowledge whether

Schindler used a rack and stack ranking process.  Reifenhauser Dep. at 45.  But none of that

evidence – which amounts to employees being unaware of a process followed by management,

not to evidence that the process was not followed by management – controverts Schindler's

---

[12]     The listed years are the only performance ratings contained in the record.  It is unknown whether
McDonnell was rated in the other years and, if so, what his rating was.

evidence that its managers actually do rate the mechanics and rank them, regardless of whether they share the results with the mechanics.

### 6. McDonnell Never Fell Asleep on the Job and Was Not a Poor Performer at L&T

McDonnell asserts that Schindler is confusing him with another mechanic when it asserts that he was caught sleeping on the job at L&T and disciplined for it.  Pl. Mem. Law Opp. at 18-19.  He also asserts that a finder of fact could conclude that Schindler's reason for terminating him was pretextual because a prior supervisor at L&T found his work to be excellent.  Pl. Mem. Law Opp. at 20.  Even if Plaintiff is correct regarding whether he was ever caught sleeping at L&T, no reasonable juror could find that Schindler's explanation for termination was pretextual because a supervisor at L&T five years prior to his termination believed he was a good performer.  There is no question of fact that Schindler's client contact at L&T had been complaining about the quality of McDonnell's work and that, when it came time to reinstate McDonnell after his medical leave, L&T would not allow him to resume work there.  Regardless of what a jury could find regarding the quality of McDonnell's work in 2006 and whether he was ever caught sleeping on the job, no reasonable jury could conclude that Schindler's explanation for the termination is pretext given the undisputed evaluation of Czerwin.

### 7.   Schindler Did Not Lay Off Other Poor Performers and Persons Who Engaged in Misconduct

Plaintiff's evidence that other mechanics with performance issues were not terminated and that he was the only service mechanic laid off during that time period, Pl. Mem. Law Opp. at 20-21, would not lead a reasonable factfinder to find that Schindler's explanation was a pretext for disability discrimination.  This argument is simply another way of articulating the argument discussed in Part (II)(b)(iii)(3), *supra*.  For the same reasons that argument could not lead a reasonable jury to conclude that Schindler's reasons for termination were pretext, this argument could not either.

### 8.   Schindler Targeted Other Employees Who Were Injured

In an attempt to demonstrate that Schindler's explanation for his discharge is pretextual, Plaintiff claims that Raymond Haines and Joseph Hagner were similarly "targeted" for termination when they returned to work after an injury.  Pl. Mem. Law Opp. at 21-23.  Haines, however, denied he was targeted because of his disability; he stated that he believed Schindler targeted him because of his union activity as the shop steward.  Haines Dep. at 78-79.[13]  Hagner was terminated three years before Plaintiff and worked in south New Jersey, not in New York. Hagner Dep. at 18.  None of Hagner's supervisors supervised Plaintiff.  Hagner Dep. at 17, 33; *cf. Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006) ("In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated" in a disparate treatment analysis.).  In any event, the mere fact

---

[13]      Haines was the only mechanic lower than Plaintiff in the 2010 rack and stack but Schindler could not lay him off under the terms of the CBA.  Def. 56.1 Stmt. ¶ 198.  The fact that Haines and McDonnell were both at the bottom of the performance evaluation rack and stack undercuts any inference that any similarity of treatment was caused by their injuries as opposed to by their poor performance.

that another employee three years prior was terminated after returning to work following an injury hardly creates an inference that either employee was terminated because of his disability.

In contrast to Plaintiff's two or three examples, Schindler offered multiple examples of employees who suffered workplace injuries and took advantage of the ERTW Program before successfully returning to Schindler as full time employees.  Haberle Decl. ¶ 6.  Indeed, Hagner's testimony confirmed the frequency of injuries like Plaintiff's when he declared: "[Y]ou get a hundred elevator guys in the room, 99 of them are limping."  Hagner Dep. at 27.  Whatever evidence Plaintiff could adduce regarding the circumstances surrounding the termination of Hagner and the alleged "targeting" of Haines, given Schindler's undisputed track record of bringing many injured employees back to work,  no reasonable jury could find that the treatment of those two employees means that Schindler's explanation for the reasons for Plaintiff's termination were pretextual.

### 9.  Email Traffic

The email among Schindler management on which Plaintiff relies to create a question of fact regarding pretext, Pl. Mem. Law Opp. at 23-25, are not helpful to his cause.  The emails reveal that in the immediate aftermath of his injury, Plaintiff failed to report to work for two days before finally supplying Schindler with a doctor's note.  Pl. Exh. JJ.  The email also indicates that the note from Plaintiff's doctor was not clear regarding the extent of Plaintiff's injury and whether he was able to return to work.  *Id*.  Without this information, Schindler could not plan for coverage of L&T.  Spampanato Supp. Decl. ¶ 16.  The following day, Spampanato's supervisor emailed Spampanato with instructions: "Call [Plaintiff] and let him know that if he can't supply us with a doctor's note by COB Monday, *stating his inability to work light or full duty*, that he is in subordinate [sic].  Also he will be subject to discipline up to and including

26

termination." Pl. Exh. KK (emphasis added). Spampanato responded, "Ok Tony [Guerrino] was

trying to contact him last night." *Id.* Plaintiff claims that this email suggests Schindler was

looking for an excuse to terminate Plaintiff immediately after his injury. Pl. Mem. Law Opp. at

24. But no reasonable jury could read the email traffic and reach that conclusion. The only

logical reading of the email is that Plaintiff did not show up to work for two days and failed to

follow proper procedure; Schindler's management discussed among themselves warning him that

if he did not follow the rules he would be subject to discipline. That email traffic is simply not

susceptible to the interpretation that Plaintiff argues.

The next set of emails on which Plaintiff relies arose when Schindler management was

preparing for Plaintiff's return as part of the ERTW Program. Pl. Exh. LL. Here again, the

email traffic reveals a company dealing with a problem employee, not discriminatory intent.

Joseph Concannon, the Regional Operations Manager, emailed Spampanato and instructed him

to make preparations for light duty assignments for Plaintiff. Pl. Exh. LL. He went on to state:

"Once he is returned to work, we can schedule an employee evaluation to address any

performance issues with HR[] (as would normally be the case)." *Id.* In a reply copied to a

member of human resources, Spampanato stated: "The building [Plaintiff] worked at does not

want him back and I have no work for him. If we take him back on light duty are we obligated

in any way to keep him employed when he comes back to full duty?" *Id.* Human resources

replied: "No – we are not Jerry. Is he on light duty now? If so, once he is released to full duty

we simply lay him off due to lack of work." *Id.*

Plaintiff argues that this exchange demonstrates discriminatory intent, but no reasonable

jury could read the email that way. Far from revealing a plot to terminate Plaintiff because of his

disability, these contemporaneous emails corroborate Schindler's position that: (1) Plaintiff had

performance issues; (2) L&T did not want McDonnell to return as its resident mechanic; and (3) Spampanato did not at that time have an available resident mechanic position into which McDonnell could be placed.  Moreover, although human resources seems to have given the green light to terminate McDonnell when he was medically fit for full duty if there continued to be no positions available, Schindler did not do so.  It kept McDonnell as an employee for ten months after he returned from a second medical leave.  None of the email or subsequent actions tend to show that Schindler's explanation for Plaintiff's termination was pretextual.

Because Plaintiff failed to present evidence that he was terminated because of his disability or under circumstances that give rise to an inference of disability discrimination, nor that Schindler's non-discriminatory reasons for his termination were pretextual, summary judgment is GRANTED on Plaintiff's claims under the ADA and the NYSHRL.

### c.  McDonnell's Claims Under the NYCHRL

#### i.  Applicable Law

Although the text of the NYCHRL mirrors the NYSHRL, *compare* N.Y.C. Admin. Code § 8-107 *with* N.Y. Exec. Law § 296, in 2005, the New York City Council broadened the protection of the NYCHRL, *see* Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85 ("Restoration Act").  Claims under the NYCHRL must therefore be analyzed "separately and independently from any federal and state law claims" and construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  *Mihalik v. Credit Agricole Cheuvreux N. Am. Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (interpreting the Restoration Act) (citations and quotations omitted).

Prior to *Mihalik*, federal district courts applied federal substantive standards to NYCHRL claims, *Mihalik*, 715 F.3d at 109, and analyzed these claims under the *McDonnell Douglas*

burden-shifting framework, *Spiegel*, 604 F.3d at 80.  The Restorative Act reduced the substantive

burden on a plaintiff to establish a claim of discrimination and required that claims be evaluated

independently of the *McDonnell Douglas* structure.  Summary judgment under Rule 56 is still an

appropriate procedural mechanism for resolving an NYCHRL claim, however, if there is no

genuine dispute as to a material fact of the plaintiff's claim.  *Mihalik*, 715 F.3d at 111-12.

"To state a claim for discrimination [under the NYCHRL], a plaintiff must only show

differential treatment of any degree based on a discriminatory motive; then, 'the employer may

present evidence of its legitimate, nondiscriminatory motives to show the conduct was not

caused by discrimination, but is entitled to summary judgment on this basis only if the record

establishes as a matter of law that discrimination played *no* role in its actions.'"  *Wolf v. Time

Warner, Inc.*, 548 F. App'x 693, 696 (2013) (summary order) (quoting *Mihalik*, 715 F.3d at 110

n.8) (emphasis in *Mihalik*).  To survive summary judgment under this more permissive standard,

"[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory

motive . . . .  [T]hat [he] has been treated less well at least in part '*because of*'" his protected

status.  *Mihalik*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, at 39,

40 n.27 (App. Div. 2009)).

In contrast with ADA and NYSHRL claims that are evaluated under the *McDonnell

Douglas* framework, once an NYCHRL plaintiff establishes he was treated less well because of

his disability, the defendant is entitled to summary judgment only if it can establish as a matter of

law that its employment decision was based strictly on non-discriminatory motives.  *Id.* at 116

("[S]ummary judgment is appropriate only if the plaintiff cannot show that [discrimination]

played *any* part in the employer's decision." (emphasis added)); *accord Wilcox v. Cornell Univ.*,

11-cv-8606(HB), 2013 WL 6027922 at *3 (S.D.N.Y. Nov. 14, 2013) (comparing *Mihalik*'s

summary judgment standard with the *McDonnell Douglas* burden-shifting framework); *but see*

*Zann Kwan v. Andalex Grp., L.L.C.*, 737 F.3d 834, 843 n.3 (2d Cir. 2013) (noting "[i]t is unclear

whether and to what extent the *McDonnell Douglas* framework has been modified for claims

under the NYCHRL" but declining to resolve the issue (citing *Mihalik*, 715 F.3d at 110 n.8)).

Nonetheless, summary judgment may be granted when "no evidence in the record . . . would

allow a reasonable jury to conclude that" the plaintiff's protected status "played any role in [her]

termination."  *Benson v. Otis Elevator Co.*, 557 F. App'x 74, 76 (2d Cir. 2014) (summary order)

(affirming dismissal of plaintiff's NYCHRL claims when plaintiff was "terminated as part of a

company-wide 'reduction in force' program" because her position was no longer needed and her

"performance was subpar"); *see also Urquhart v. Metro. Transp. Auth.*, 975 F. Supp. 2d 320, 336

(S.D.N.Y. 2013) (granting summary judgment on an NYCHRL claim because plaintiff failed to

raise an issue of material fact as to whether he was treated differently "at least in part" because of

"discriminatory motives").

      For the same reasons that Plaintiff's evidence fails to give rise to an inference of

discrimination to establish his *prima facie* case, Plaintiff has likewise failed to present evidence

that would suggest his termination was at all motivated by disability discrimination.  Plaintiff's

lack of experience or training with TXR-5 equipment significantly limited his opportunities for

placement.  He consistently received low performance reviews, and he was difficult to manage

and supervise.  Schindler's ERTW Program went above and beyond its responsibilities towards

its injured employees.  Injuries like Plaintiff's appear to be fairly common among elevator

mechanics.  Although Spampanato believed he would not have a position for Plaintiff upon his

recovery before Plaintiff began the ERTW Program, Schindler permitted Plaintiff to work light

duty assignments at full pay for three months while he was still recovering.  Schindler then

accepted Plaintiff back to work for a full ten months after he recovered even though it had no full time position available. Plaintiff has offered no evidence that similarly situated employees were given positions that he was not; Plaintiff has pointed only to positions that he neither applied for nor was trained to perform. Nor has Plaintiff offered any evidence that any Schindler employee made disparaging comments about Plaintiff's disability. Perhaps most persuasive, Plaintiff was able to perform *full duty* work -- his injury did not require any accommodation and he was just one of many similarly injured mechanics. He therefore failed to produce evidence of any degree of differential treatment, let alone evidence that he was treated "less well . . . *because of*" his disability. *Mihalik*, 715 F.3d at 110.

Accordingly, summary judgment on Plaintiff's NYCHRL claims is appropriate under the more liberal standard set forth in *Mihalik*.

### d.  Aider and Abettor Claims Against Spampanato

Because Schindler is entitled to summary judgment on the claims of discrimination under the NYSHRL and NYCHRL, it follows that Spampanato is entitled summary judgment on the claims of aiding and abetting discrimination. *See Jain v. McGraw-Hill Cos., Inc.*, 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011), *aff'd*, 506 F. App'x 47 (2d Cir. 2012) ("[T]he NYSHRL and NYCHRL require that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor.").

### III.   CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment is GRANTED

on all claims.  The Clerk of Court is directed to enter judgment for Defendants, to terminate Dkt.

18, and to terminate the case.


**SO ORDERED.**


**Dated:** **July 16, 2014**                    **VALERIE CAPRONI**
      **New York, NY**                     **United States District Judge**